**DORESSIA T. MCKEE (In her Individual Capacity and as Personal Representative of the the Estate of Freddie L. McKee)** )
)
)
)
Plaintiff, )
)
)  Case No.  2:23-CV-04157-SRB
v. )
)
**CITY OF COLUMBIA, MISSOURI,** )
Serve:  Mayor Barbara Buffaloe )
      701 E. Broadway )
      Columbia, MO 65205 )  JURY TRIAL DEMANDED
)
And )
)
)
**STEVE WILMOTH (In His Individual Capacity and Official Capacity),** )
)
Serve:  Steven Wilmoth )
      600 E. Broadway )
      Columbia Mo 65205) )
)

**Defendants.**
Matthew Gremore
Harlan Hatton
Julie Ray
D Shawn Seawood
Dylan Kelly
Neal Sedgwick
John Doe #7
John Doe#8

**PETITION FOR DAMAGES**

      Comes now Plaintiff Doressia T. McKee (hereinafter referred to as "Plaintiff"), and for

her Petition for Damages against Defendants, states as follows:

**Parties**

1. Plaintiff Doressia T. McKee is an individual over the age of 18, and currently and at all times relevant, a citizen and resident of the State of Missouri.

2. Plaintiff is the natural mother of Freddie L. McKee (hereinafter referred to as "Decedent"), who died on July 8, 2020.

3. Plaintiff has been appointed Personal Representative of the Estate of Freddie L. McKee via Cause No. 20BA-PR00345, and is thereby authorized to pursue the claims set forth herein that are taken on behalf of the Estate of Freddie L. McKee.

4. Defendant City of Columbia, Missouri (hereinafter referred to as "City") is a municipality located in the State of Missouri.

5. Defendant City operates and controls a police department, commonly known as the Columbia Police Department.

6. Defendant Steve Wilmoth is an individual over the age of 18 and, at all times relevant herein, was employed as a police officer/detective by Defendant City.

**Death of Freddie L. McKee and Defendant Wilmoth's "Investigation"** . Defendants Matthew Gremore, Julie Ray, Dylan Kelly, Harlon Hatton, Neal Sedgwick, and others

7. In July 2020  Plaintiff lived in Columbia, Missouri, in a home she shared with her son, Decedent.

8. At the time, Decedent was thirty-seven years old.

9. Decedent's father, Freddie Gardner, also lived in Columbia, Missouri, in a home located at 11 Switzer Ave.

10. Decedent's half-brother, Cortez Gardner, lived at and was at the house on the days before the death of  Freddie L Mckee and on the day of and the night of, and the morning of Freddie Lee McKee's death with Freddie Gardner at  11 Switzer Ave

11. Switzer Ave is located in a predominantly low-income, African American neighborhood.

12.     Decedent would occasionally stay with Freddie Gardner, but generally Decedent lived with Plaintiff.

13.     On the night of July 7, 2020 (into the morning of July 8, 2020), Decedent was staying at Freddie Gardner's house on Switzer Ave.

14.     t approximately 1:30 a.m. on July 8, 2020, Decedent sent Plaintiff a text message, and he also sent a text message to his Uncle.  This text message was ordinary and routine and contained no indication of anything unusual occurring with the Decedent.

15.     At approximately 2:45 a.m., a neighbor on Switzer Ave made a 911 call reporting that a black man, approximately thirty to forty years old, appeared to be searching for his cell phone in her yard, which was making her dogs bark.

16.     The caller was an African American female (hereinafter "Neighbor").

17.     Officers were dispatched to the scene, but there is no clear record of what occurred when they arrived on the scene.

18.     At approximately 6:03 a.m., Freddie Gardner made a 911 call reporting that he found his son dead on the front step of his home.

19.     Officers and personnel from the Fire Department reported to the scene.

20.     At some point between 6:30 and 7:00 a.m., Plaintiff received a call from Cortez Gardner and his girlfriend informing her that her son was dead, and that I Cortez Gardner found Freddie L McKee's  body.

21.     Plaintiff immediately went to Freddie Gardner's home on Switzler Street.

22.     Defendant Steve Wilmoth was the lead detective charged with investigating the death of the Decedent.

23.     Wilmoth arrived on the scene at approximately 7:10 a.m.

24.     At approximately 7:15 a.m., Stacey Huck, an investigator with the Medical

Examiner's Office, arrived on the scene.

25. Decedent's body was located outside the front of the residence, near the end of a wheelchair porch ramp, the 911 caller that reported the death stated that the body was located on the step area, when police arrived it had been moved, was no longer on the steps area, was at the end of the ramp area. Decedent was covered with a blanket, and the black car in the driveway had been moved.

26. Decedent was on his back with his right arm in an upright position, stiff.

27. Decedent was not wearing a shirt, his jeans were pulled down below his waist, the front of the decedent's pants were muddy with white rock dust. It was still 83 degrees

28. Decedent was wearing one sock and was only wearing one shoe.

29. Decedent's body had evidence of significant injuries, the body was covered with "Significant" abrasions, wounds, cuts, and contusions.

30. One of the Decedent's fingernails was partially ripped off. Blood from the ripped nail had been cleaned and wiped away.

31. At approximately 7:41 a.m., Decedent's body was transported from the scene to a local funeral home.

32. While on the scene, Plaintiff spoke to a Neighbor and learned of the 911 call she made at 2:45 am regarding the decedent well-being.

33. Plaintiff stated the neighbor 911 caller confirmed that the person she saw was the Decedent.

34. Plaintiff also spoke with Defendant Wilmoth on scene, and again later that morning at the Police Station with two other people, asking why he refused to speak with the person that called 911, again Defendant Steven Wilmoth stated it has nothing to do with the decedent's death, and it does not matter. If I speak with Ann, she too will just lie.

4

35.     Plaintiff informed Defendant Wilmoth, among other things, that: (i) Freddie Gardner was a drug dealer;  Wilmoth stated to Plaintiff so what that has nothing to do with the decedents death(ii) Plaintiff informed Wilmoth of an incident that happened at 11 Switzler where Freddie L Mckee had to get medical attention at University Hospital, Freddie Gardner had instructed Cortez Gardner to assault Decedent in the past, Wilmoth stated to Plaintiff,  people in the streets told me not to believe nothing you say (iii) Neighbor had seen Decedent before his death and called 911 (iv) Neighbor found Decedent's cell phone and shoe in her yard, and (v) Freddie Gardner had Decedent's wallet and it was missing all of his credit cards and cash. Wilmoth stated to the Plaintiff that maybe Freddie L McKee buried it, and refused to ask Freddie L Gardner how he got the wallet.

35.     In addition, Plaintiff asked Defendant Wilmoth to follow up on the foregoing evidence and inconsistencies, but Defendant Wilmoth refused.

36.     In doing so, Defendant Wilmoth stated, "all the neighbors (who are black) were on drugs and notworthy of telling the truth."

37.     Defendant Wilmoth also told Plaintiff  that he would not interview the 911 call or any other Neighbors because they weren't going to "tell the truth and were drug users."

38.     Moreover, Defendant Wilmoth falsely told Plaintiff that there was no record of a 911 call from a Neighbor that morning.

39.     Defendant Wilmoth told Plaintiff that he was not going to interview Freddie L Gardner or Cortez Gardner;however, another detective, Jonathan Voss, "briefly" spoke to Freddie Gardner on the scene. Plaintiff informed Wilmoth of the 3 cameras on the outside of the house. Plaintiff informed Wilmoth that Cortez Gardner and his girlfriend called her at or around 6:05 and stated that "Cortez Gardner "found Freddie L Mckee dead this morning when

5

he was on his way to pick up his girlfriend from work. Defendant Wilmoth stated So I'm not going to ask him anything. Cortez Gardner was at the scene on July 8, 2020, The Plaintiff pointed Cortez Gardner out to Defendant Wilmoth. Cortez Gardner was never interviewed at the scene.

40. Plaintiff informed Defendant Wilmoth of the cameras that were on the outside of the house. During the interview, Voss asked Gardner about the security cameras posted on the outside of the home, as they were visible. Voss stated it did not appear that the cameras recorded, Voss stated it looks like it was just a live view.

41. Freddie Gardner said they do not record footage. Freddie Gardner never stated how you operated the camera system, and Voss is not sure if it worked are how it worked.

42. Voss and the lead Detective), Defendant Wilmoth accepted Freddie Gardner's statement and took no further action to determine whether Freddie Gardner's statement that the video cameras didn't recordwas in fact true. Voss's answer was, it appeared as if the cameras did not record, Voss really could not give a yes or no answer, and Voss never took the cameras, nor did the lead Detective "Defendant Wilmoth" take the cameras to assure a positive finding that there was no footage of the Death of Freddie L Mckee, and or what happened leading up to Freddie L Mckee death.

43. Defendant Wilmoth, nor anyone else, ever investigated the 911 call or the missing credit cards and cash from Decedent's wallet, and in fact that they (lead Detective), Defendant Wilmoth did not even put the wallet in evidence despite the fact it was in Defendant Wilmoth possession from July 8, 2020 at Columbia Police Department for over two weeks. Defendant Wilmoth took the wallet but never put it in evidence. Plaintiff called the Columbia Police Department to pick up the wallet. Never protected the scene, never collected any evidence, never investigated who the supervisor was that held the 911 call.

44. In his Investigative Report, Defendant Wilmoth indicates that he made a call to Stacey Huck on July 8, 2020, and that she told him "The autopsy of Freddie McKee was complete, and there was no trauma found or obvious cause of death. Autopsy showed evidence of Significant injuries.

45. Defendant Wilmoth's statement that he was told there was no trauma found on decedent's body. "Lead Detective" Defendant Wilmoth received a copy of the autopsy on July 9, 2020, which included the Boone County Medical Examiner's medical opinion that stated evidence of significant injuries to Freddie McKee's body. Steven Wilmoth, Julie Ray, Chief Jones. Harlan Hatton and others still refused to properly investigate after receiving the autopsy showing evidence or significant injuries

46. The autopsy report indicates evidence of "Significant Injuries" at least 13 abrasions, seven contusions, and lacerations; evidence of injury was visible and present on the Decedent's body on July 8, 2020.

47. Defendant Wilmoth's Investigative Report also shows that he immediately closed the case upon arrival on July 8, 2020, the same day that the Decedent died, within 15 minutes after he arrived on the scene. Plaintiff and two other people on July 8, 2020, spoke with the Lead Detective. Defendant Wilmoth at the Columbia Police Department.

48. Specifically, the Investigative Report led by Defendant Wilmoth indicated immediately: "At this time, this case should be considered closed/inactive pending toxicology." Interviewing only one person, Freddie L Gardner,

49. On that same date, July 8, 2020, the Medical Examiner's Office sent blood samples to NMS Forensic Toxicology Laboratory.

50. On July 11, 2020, Plaintiff called the Columbia Police Department because she was concerned that Defendant Wilmoth did not conduct a reasonable or lawful investigation

7

into Freddie McKee's death because of his race. I called CPD and spoke with Detective Joel Mueller, who followed the law, protocol by recording our conversation.

51.     The telephone conversation with Mueller was ninety-five minutes long and recorded by Mueller. Mueller was not involved in the death investigation. Mueller recorded his phone conversation

52.     Plaintiff told Mueller, among other things, that: (i) the security cameras on Freddie Gardner's house do in fact record, (ii) Freddie Gardner and Cortez Gardner had been telling different versions of what occurred the morning of July 8, 2020, as Cortez Gardner had told at least two people that he was the one that discovered Decedent's body (while Freddie Gardner told the police he had discovered Decedent's body), and (iii) Defendant Wilmoth was refused to talk to Neighbor, Cortez, and even the though Neighbor who saw Decedent shortly before his death and had called 911.

53.     Thereafter, Detective Mueller located the recording of the Neighbor's 911 call and informed Defendant Wilmoth. Plaintiff stated she had given defendant Wilmoth the name and number of the 911 caller on July 8, 2020.

54.     Plaintiff filed a complaint with Wilmoth's supervisor, Harlan Hatton, in person at the Columbia Police Department, and she spoke with Harlan Hatton about her interview with Wilmoth on July 8, 2020. Plaintiff told Harlan Hatton that the reason Wilmoth stated he was not able to investigate her son's death was because the neighbors would not tell the truth and would just lie, and most were drug users.  Hatton replied Yes, Wilmoth's words are a little sensitive, but I'll speak with him about that. No, Wilmoth's words were extremely biased  and discriminatory

55.     Plaintiff in the company of another witness told Harlan Hatton while at CPD filing her complaint of the interview with  Defendant Wilmoth,  Plaintiff asked Defendant

8

Wilmoth who's was his supervisors, Plaintiff asked Defendant Wilmoth about his conduct and his very aggressive behavior, Plaintiff asked Defendant Wilmoth about the racist/discriminatory words he used, during a death investigation as if he knew Plaintiff personally, Plaintiff told Wilmoth his obligation was to investigate the death, not tell me his death doesn't matter and so what. Plaintiff asked if that was part of their training, and Defendant Wilmoth stated "Yes." Defendant Wilmoth stated no matter who you contact, this case will never be reopened and no one in this neighborhood will be interviewed. Yes, no one, never. Plaintiff asked Defendant Wilmoth are you telling me this is protocol Defendant Wilmoth stated Yes.

56.    Harlan Hatton stated in his meeting with Plaintiff that Defendant Wilmoth will go back and speak with the person who called 911, I'm his supervisor, and when I tell him to do something, he will do it, Harlan Hatton stated I think the words Wilmoth used were just a little sensitive. Eventually, 12 days later, on July 21, 2020, Defendant Wilmoth made a call to the Neighbor, the 911 caller, never recording the phone conversation. However, the call was brief, and Defendant Wilmoth did not record the conversation, as required while at the home of the 911 caller, Defendant Wilmoth went to the 911 caller's home to pick up the shoe, but again, Defendant Wilmoth didn't have his Body Worn Camera on, as required. Defendant Wilmoth conducted no additional follow-up or investigation thereafter, even when he read the autopsy report on July 9, 2020 of the significant injuries to the body, Wilmoth and others refused to forward the death investigation and all of their reports over to the Boone County prosecutor's office for review. The investigation into the death of Freddie Mckee death met all the requirements that warranted the Boone County prosecutor's office to review the death and the investigation. Chief Jones, Wilmoth, Internal Affairs, Julie Ray, the

City Manager, De Carlon Seawood, and others refused to forward the

investigation over to the Boone County prosecutor's office to vet and review

57.    On July 26, 2020, NMS Forensic Toxicology Laboratory sent its toxicology

report to the Medical Examiner's Office.

58.    The only components detected in Decedent's blood were caffeine,

citalopram/escitalopram (an antidepressant), and olanzapine (brand name Zyprexa).

59.    Defendant Wilmoth, nor anyone else, informed Plaintiff of this toxicology report.

60.    For reasons unknown to Plaintiff, NMS Forensic Toxicology Laboratory sent a

second toxicology report to the Medical Examiner's Office on September 11, 2020.

61.    This time, in addition to caffeine, citalopram/escitalopram, and olanzapine, the

report stated the following components were detected in Decedent's blood: Nicotine, Cotinine,

and Ethylene.

62.    On October 21, 2020, the Medical Examiner's Office, specifically Dr. Carl Stacy,

signed the final ME Report.

### Plaintiff's Complaint Against Defendant Wilmoth.  Matthew Gremore, Julie Ray, Dylan Kelly, Harlon Hatton, Neal Sedgwick, and others

63.    On April 28, 2021, Plaintiff submitted a complaint to the Columbia Police

Department regarding the investigation, or lack thereof, into the death of the Decedent.

64.    Specifically, Plaintiff alleged that Defendant Wilmoth violated police policy

600.2, Initial Investigations,

65.    On October 7, 2021, Chief Geoff Jones sent a letter to Plaintiff stating he had

determined Plaintiff's complaint to be "Unfounded." Chief Jones failed to show evidence

that Wilmoth conducted a proper, lawful, and justifiable investigation. It's unreasonable for

anyone to believe a lawful and fair investigation was completed within 10 minutes

66.     On November 23, 2021, Plaintiff appealed Chief Jones' decision to the City of Columbia's Citizens Police Review Board (hereinafter "CPRB"). Plaintiff hired an attorney out of St Charles, MO, to handle her appeal

67.     On November 30, 2021, Wayne Boykin, Chair of the CPRB, sent a letter to Plaintiff indicating that the CPRB had unanimously concluded there were sufficient facts to prove Defendant Wilmoth engaged in misconduct, and that they were recommending (which is all the power they have) is to legally ask Chief Jones to reconsider his "Unfounded" decision and find that Plaintiff's complaint is highly sustained.

68.     On December 8, 2021, Chief Jones sent a letter to the CPRB informing it that he was reopening the investigation into Plaintiff's complaint against Defendant Wilmoth, and also reopening the investigation into the death of Decedent. The case was never reopened as promised, and as stated in the letter, Chief Jones stated that he was going to assign the reopening of the case to a very experienced detective, Matthew Gremore, who stated that he did not know anything about the 911 call or the investigation. Matthew Gremore never reopened the investigation, never contacted the 911 caller, or investigated why the 911 call was never investigated, who the supervisor was at CPD on July 8, 2020, who ordered the 911 call to be held until 3:45 am. Until it was too late, Freddie Mckee had passed away waiting for the police 911 to arrive. The plaintiff states that Steven Wilmoth refused, stating there was never a 911 call made. Steven Wilmoth was informed once on the scene that Ann, a black neighbor, had placed a call to 911 at 2:45 am requesting police investigate the black male subject who was in her yard, who seemed to need help. Ann stated that she told the black male that she was going to call the police, and that person stated Yes, ok, call them. Ann stated that she

11

watched the black male go to 11 Switzer Ave. Ann stated she informed the 911 dispatcher of his location, where the black male was last seen at 11 Switzler Ave, alive between 245 am and 3:30 am. Detective Mueller also informed Wilmoth of the 911 call and Wilmoth still refused to investigate.

**Count I**
**Title VI – Intentional Race Discrimination**
**Plaintiff (In Her Individual Capacity) v. City of Columbia, Missouri, and Steve Wilmoth (In His Official Capacity) . Defendants Matthew Gremore, Julie Ray, Dylan Kelly, Harlon Hatton, Neal Sedgwick, and others**

69.    Plaintiff incorporates by reference all of the preceding paragraphs, and further alleges as follows:

70.    Title VI of the Civil Rights Act of 1964 states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

71.    Defendant City receives Federal financial assistance from numerous programs.

72.    For example, City receives Federal financial assistance via the CARES Act and the American Rescue Plan.

73.    In addition, City receives annual funds through the Federal Asset Forfeiture Program/Federal Equitable Sharing Fund (administered by the DOJ), which provides funds to participating police departments around the country obtained through assets seized as a result of joint criminal investigations with the DOJ.

74.    Plaintiff and Decedent are both African American.

75.    Defendant Wilmoth is Caucasian.

76.    Defendants are required, via Title VI, to conduct death investigations involving

African American decedents with equal effort as death investigations involving Caucasian and/or non-African American decedents.

77.      Put another way, police officers are not allowed to intentionally conduct a pseudo-death investigation due to the fact that the decedent is African American.

78.      Defendants failed to provide even the basic minimum effort of a proper death investigation with regard to the investigation of the death of the Decedent.

79.      Specifically, Defendants failed to: (i) conduct a timely or meaningful interview of Neighbor, (ii) conduct a meaningful interview of Freddie Gardner, (iii) conduct an interview of Cortez Gardner, (iv) follow up and/or investigate the validity of Freddie Gardner's statement that his security cameras do not record, (v) follow up and/or investigate conflicting stories from Freddie Gardner and Cortez Gardner, (vi) follow up and/or investigate Decedent's missing credit cards, wallet, and cash, (vii) falsely tell Plaintiff Neighbor did not make a 911 call, (viii) falsely state thatthere was no trauma to Decedent's body, and (ix) refuse to take into account the suspicious circumstances surrounding Decedent's death, including the numerous injuries to his body, the fact that his clothes were muddy (as if he had been dragged), and the fact his shoe and cell were missing when he his body was found, and the fact that it was said to be a well-known drugs house, the fact that Freddie l Gardner  was on probation for felon in possession of a fire arm, and had been just arrested on a DUI for the tenth time, and the fact that he was arrested prior to his felon in possession of fire arm for assaulting his biological sister whom lived with him from a child to adult. Freddie L Gardner was arrested, jailed, and put on probation. Freddie L Gardner, prior to the firearms charge, Freddie L Gardner beat his daughter, and Columbia Public School called State Child Protective Services and the daughter was taken away and never given back.  .

80.      In other words, Defendant Wilmoth conducted a pseudo-death investigation

13

into the death of Decedent due to the fact that Decedent was African American.

81.    Defendants Wilmoth's failures were intentional because of Decedent's race, i.e., were motivated by anintent to discriminate, as evidenced by, *inter alia*, Wilmoth's statement that "all black people were on drugs and not worthy of telling the truth." Defendant stated in his report that Plaintiff was an angry Woman, in other words, a black angry woman.

82.    Plaintiff was damaged as a result of the Defendants' intentional discrimination and his intent to cause injury.

WHEREFORE, Plaintiff prays for judgment in her favor and against Defendants for damages in excess of $25,000, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees, and for such other and further relief as the Court deems just.

<u>**Count II**</u>
<u>**Title VI – Intentional Race Discrimination**</u>
<u>**Plaintiff (As Personal Representative of the Estate of Freddie L. McKee) v. City of Columbia, Missouri, and Steve Wilmoth (In His Official Capacity.  Defendants Matthew Gremore, Julie Ray, Dylan Kelly, Harlon Hatton, Neal Sedgwick, and others.**</u>

83.    Plaintiff incorporates by reference all of the preceding paragraphs, and further alleges as follows:

84.    Title VI of the Civil Rights Act of 1964 states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

85.    Defendant City receives Federal financial assistance from numerous programs.

86.    For example, City received Federal financial assistance via the CARES Act and the American Rescue Plan.

87.    In addition, City receives annual funds through the Federal Asset Forfeiture

Program/Federal Equitable Sharing Fund (administered by the DOJ), which provides funds to participating police departments around the country from the DOJ obtained through assets seizedas a result of joint criminal investigations.

88.   Decedent is African-American.

89.   Defendant Wilmoth is Caucasian.

90.   Defendants are required, via Title VI, to conduct death investigations involving African American decedents with equal effort as death investigations involving Caucasian and/or non-African-American decedents.

91.   Put another way, police officers are not allowed to intentionally conduct a pseudo-death investigation due to the fact that the decedent is African American.

92.   Defendants failed to provide even the basic minimum effort of a proper death investigation with regard to the investigation of the death of the Decedent. When there was evidence, the dispatcher stated of a suspicious death due to the prior activity at 11 Switzer Ave and the injuries to the body, Freddie L Gardner's prior violent criminal history, and Cortez Gardner's violent criminal history, with hospital records of prior evidence of violent attacks.

93.   Specifically, Defendants failed to: (i) conduct a timely or meaningful interview of Neighbor, (ii) conduct a meaningful interview of Freddie Gardner, (iii) conduct an interview of Cortez Gardner, (iv) follow up and/or investigate the validity of Freddie Gardner's statement that his security cameras do not record, (v) follow up and/or investigate conflicting stories from Freddie Gardner and Cortez Gardner, (vi) follow up and/or investigate Decedent's missing credit cards and cash, (vii) falsely tell Plaintiff Neighbor did not make a 911 call, (viii) falsely state that there was no trauma to Decedent's body, and (ix) refuse to take into account the suspicious circumstances surrounding Decedent's death, including the numerous injuries to his body, the

15

fact that his clothes were muddy (as if he had been dragged), and the fact his shoe and cell were missing when he his body was found, and refusing to investigate the 911 call and the reason for holding the call for an hour, refusing to investigate who the supervisor was at CPD on July 8, 2020 at 2:45 that ordered to hold the call with no other emergency in Columbia Mo on July 8, 2020, that would justify holding the call, who hid his identity in the 911 joint communication report for 3 years and never stated the reason why he held the call and them lied and stated he knew nothing about the 911 call.

94.    In other words, Defendant Wilmoth intentionally conducted a pseudo-death investigation into the death of Decedent due to the fact that Decedent was African American. Steven Wilmoth actions, racist words and conduct showed a clear and deliberate indifference in the value of the decedent life. .

95.    Defendants' failures were because of Decedent's race, i.e., were motivated by an intent to discriminate, as evidenced by, *inter alia*, Wilmoth's statement that "all black people were on drugs and not worthy of telling the truth."

96.    Decedent was damaged as a result of Defendants' intentional discrimination.

WHEREFORE, Plaintiff prays for judgment in her favor and against Defendants for damages in excess of $25,000, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees, and for such other and further relief as the Court deems just.

### Count III
### 42 U.S.C. § 1983
### Fourteenth Amendment Violation – Equal Protection
### Plaintiff (In Her Individual Capacity) v. Steve Wilmoth (In His Individual Capacity).
### Defendants Matthew Gremore, Julie Ray, Dylan Kelly, Harlon Hatton, Neal Sedgwick, and others

97.    Plaintiff incorporates by reference all of the preceding paragraphs and

16

further alleges:

98.     Plaintiff brings this action against Defendant Wilmoth in his individual capacity.

99.     American citizens, including Plaintiff, are entitled to equal protection under the law pursuant to the Fourteenth Amendment of the U.S. Constitution.

100.    As such, police officers are required to conduct death investigations involving African American decedents with equal effort as death investigations involving Caucasian and/or non-African-American decedents.

101.    Put another way, police officers are not allowed to intentionally conduct a pseudo-death investigation due to the fact that the decedent is African American.

102.    The right of equal protection under the law has long been recognized by courts across the United States of America, including the right of citizens not to be treated worse by police officers due to their race.

103.    Plaintiff and Decedent are both African American.

104.    Defendant Wilmoth is Caucasian.

105.    Defendant Wilmoth failed to provide even the basic minimum effort of a proper death investigation with regard to the investigation of the death of Decedent. Defendant Wilmoth used racist language, and stated to the Plaintiff and two others so what it does not matter

106.    Specifically, Defendant Wilmoth failed to: (i) conduct a timely or meaningful interview of Neighbor, (ii) conduct a meaningful interview of Freddie Gardner, (iii) conduct an interview of Cortez Gardner, (iv) follow up and/or investigate the validity of Freddie Gardner's statement that his security cameras do not record, (v) follow up and/or investigate conflicting stories from Freddie Gardner and Cortez Gardner, (vi) follow up and/or investigate Decedent's missing credit cards and cash, (vii) falsely tell Plaintiff Neighbor did not make a 911 call, (viii)

falsely state that there was no trauma to Decedent's body, and (ix) refuse to take into account the suspicious circumstances surrounding Decedent's death, including the numerous injuries to his body, the fact that his clothes were muddy (as if he had been dragged), and the fact his shoe and cell were missing when he his body was found.

107.     In other words, Defendant Wilmoth and others intentionally conducted a pseudo-death investigation into the death of Decedent due to the fact that Decedent was African-American.

108.     Defendant Wilmoth's failures were because of Decedent's race, i.e., were motivated by an intent to discriminate, as evidenced by, *inter alia*, Wilmoth's statement that "all black people were on drugs and not worthy of telling the truth."

109.     Defendant Wilmoth was acting or purporting to act in the performance of his official duties, and as such was acting under color of law.

110.     Because of Defendant Wilmoth's conduct, Plaintiff suffered damages, including, but not limited to, pain, suffering, emotional distress, and loss of enjoyment of life.

111.     If Plaintiff prevails, she is entitled to an award of attorney's fees.

WHEREFORE, Plaintiff prays for judgment in her favor and against Defendant Wilmoth for damages in excess of $25,000, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees, and for such other and further relief as the Court deems just.

**Count IV**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation – Equal Protection**
**Plaintiff In Her Individual Capacity and (As Personal**
**Representative of the Estate of**
**Freddie L. McKee) v. Steve Wilmoth (In His Individual Capacity)**

112.     Plaintiff incorporates by reference all of the preceding paragraphs and

further alleges:

113.   Plaintiff brings this action against Defendant Wilmoth in his individual capacity.

114.   American citizens, including Decedent, are entitled to equal protection under the law pursuant to the Fourteenth Amendment of the U.S. Constitution.

115.   As such, police officers are required to conduct death investigations involving African-American decedents with equal effort as death investigations involving Caucasian and/or non-African-American decedents.

116.   Put another way, police officers are not allowed to intentionally conduct a pseudo-death investigation due to the fact that the decedent is African-American.

117.   The right of equal protection under the law has long been recognized by courts across the United States of America, including the right of citizens not to be treated worse by police officers due to their race.

118.   Decedent was African-American.

119.   Defendant Wilmoth is Caucasian.

120.   Defendant Wilmoth failed to provide even the basic minimum effort of a proper death investigation with regard to the investigation of the death of Decedent.

121.   Specifically, Defendant Wilmoth failed to: (i) conduct a timely or meaningful interview of Neighbor, (ii) conduct a meaningful interview of Freddie Gardner, (iii) conduct an interview of Cortez Gardner, (iv) follow up and/or investigate the validity of Freddie Gardner's statement that his security cameras do not record, (v) follow up and/or investigate conflicting stories from Freddie Gardner and Cortez Gardner, (vi) follow up and/or investigate Decedent's missing credit cards and cash, (vii) falsely tell Plaintiff Neighbor did not make a 911 call, (viii) falsely state that there was no trauma to Decedent's body, and (ix) refuse to take into account the suspicious circumstances surrounding Decedent's death, including the numerous injuries to his

19

body, the fact that his clothes were muddy (as if he had been dragged), and the fact his shoe and cell were missing when he his body was found.

122.     In other words, Defendant Wilmoth intentionally conducted a pseudo-death investigation into the death of Decedent due to the fact that Decedent was African-American.

123.     Defendant Wilmoth's failures were because of Decedent's race, i.e., were motivated by an intent to discriminate, as evidenced by, *inter alia*, Wilmoth's statement that "all black people were on drugs and not worthy of telling the truth."

124.     Defendant Wilmoth was acting or purporting to act in the performance of his official duties, and as such was acting under color of law.

125.     Because of Defendant Wilmoth's conduct, Decedent suffered damages, including, but not limited to, being denied a proper investigation into his death.

126.     If Plaintiff prevails, she is entitled to an award of attorney's fees.

WHEREFORE, Plaintiff prays for judgment in her favor and against Defendant Wilmoth for damages in excess of $25,000, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees, and for such other and further relief as the Court deems just. for damages in excess of $25,000, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees, and for such other and further relief as the Courtdeems just.

### Count V
### Intentional Infliction of Emotional Distress (Missouri Common Law)
### Plaintiff (In Her Individual Capacity) v. Steve Wilmoth (In His Individual Capacity)
### .  Defendants, Matthew Gremore, Julie Ray, Dylan Kelly, Harlon Hatton, Neal Sedgwick, and others

127.     Plaintiff incorporates by reference all of the preceding paragraphs and further alleges:

128.     Plaintiff brings this action against .Defendants Steven Wilmoth, Matthew Gremore,

20

Julie Ray, Dylan Kelly, Harlon Hatton, Neal Sedgwick, and others Wilmoth in his individual capacity.

129.    Defendants  Steven Wilmoth, Matthew Gremore, Julie Ray, Dylan Kelly, Harlon Hatton, Neal Sedgwick, and others conduct as set forth in more detail above was extreme and outrageous.

130.    Defendant Wilmoth's conduct as set forth in more detail above was done in an intentional and/or reckless manner.

131.    The acts of Defendant Wilmoth were intentional, wrongful, done with knowledge they were wrongful, done with malice, done in bad faith, and done with reckless or conscious disregard for the rights of Plaintiff such that Defendant is not entitled to official immunity and so as to entitle Plaintiff to an award of punitive damages against Defendant Wilmoth.

132.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered severe emotional distress that resulted in bodily harm that is medically diagnosable and medically significant, including but not limited to severe anxiety, depression, insomnia, and other ailments.

WHEREFORE, Plaintiff prays for judgment in her favor and against Defendant Wilmoth for damages in excess of $25,000, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees, and for such other and further relief as the Court deems just.

### Count VI
### Negligent Infliction of Emotional Distress (Missouri Common Law)
### Plaintiff (In Her Individual Capacity) v. Steve Wilmoth (In His Individual Capacity).  Defendants Matthew Gremore, Julie Ray, Dylan Kelly, Harlon Hatton, Neal Sedgwick, and others

133.    Plaintiff incorporates by reference all of the preceding paragraphs and further alleges:

134.    Plaintiff brings this action against Defendant Wilmoth in his individual capacity.

135.    Defendant Wilmoth was required to use that degree of care that an ordinarily careful person would use under the same or similar circumstances in conducting the investigation into the death of Decedent.

136.    Defendant Wilmoth failed to use that degree of care that an ordinarily careful person would use under the same or similar circumstances in conducting the investigation into the death of Decedent, and was therefore negligent, in that he failed to: (i) conduct a timely or meaningful interview of Neighbor, (ii) conduct a meaningful interview of Freddie Gardner, (iii) conduct an interview of Cortez Gardner, (iv) follow up and/or investigate the validity of Freddie Gardner's statement that his security cameras do not record, (v) follow up and/or investigate conflicting stories from Freddie Gardner and Cortez Gardner, (vi) follow up and/or investigate Decedent's missing credit cards and cash, (vii) falsely tell Plaintiff Neighbor did not make a 911 call, (viii) falsely state that there was no trauma to Decedent's body, and (ix) refuse to take into account the suspicious circumstances surrounding Decedent's death, including the numerous injuries to his body, the fact that his clothes were muddy (as if he had been dragged), and the fact his shoe and cell were missing when he his body was found.

137.    Defendant Wilmoth's negligence involved an unreasonable risk of causing emotional distress.

138.    Defendant Wilmoth knew or, by using ordinary care, could have known of such risk.

139.    As a direct and proximate cause of Defendant Wilmoth's negligence, Plaintiff suffered severe emotional distress that resulted in bodily harm that is medically diagnosable and medically significant, including but not limited to severe anxiety, depression, insomnia, and other ailments.

140.    The acts of Defendant Wilmoth were intentional, wrongful, done with knowledge they were wrongful, done with malice, done with a preconceived mindset, done in bad faith, and done with reckless or conscious disregard for the rights of Plaintiff such that Defendant is not entitled to official immunity and so as to entitle Plaintiff to an award of punitive damages against Defendant Wilmoth.

WHEREFORE, Plaintiff prays for judgment in her favor and against Defendant Wilmoth for damages in excess of $25,000, including actual damages and punitive damages, for the costs incurred herein and expended, for attorneys' fees, and for such other and further relief as the Court deems just.

Respectfully submitted,

By Doressia T Mckee
    PO. Box 6
    Columbia Mo 65205
    573- 639-7613
    Proceeding Pro Se

23